1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT FOR THE**
9              **EASTERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| CHRIS HILL, | 1:06-cv-00939-AWI-DLB |
| Plaintiff, | ORDER DENYING MOTION TO APPLY NEW JERSEY LAW TO REQUEST FOR PUNITIVE DAMAGES |
| v. | |
| NOVARTIS PHARMACEUTICAL CORPORATION; and DOES 1 through 20, inclusive, | (Docs. 29-29-15) |
| Defendants. | |

## I. INTRODUCTION

Defendant Novartis Pharmaceutical Corporation has filed a motion to apply New Jersey law to plaintiff Chris Hill's request for punitive damages.  Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court denies the motion.

## II. FACTS AND PROCEDURAL BACKGROUND

On June 29, 2006, plaintiff Chris Hill ("Plaintiff") filed her complaint in San Joaquin Superior Court against defendants Novartis Pharmaceutical Corporation and Does 1 through 20, inclusive, asserting

two causes of action for strict products liability and negligence.  Plaintiff alleged as follows:

> "01.  Plaintiff CHRIS HILL is a citizen of the State of California . . . . A doctor prescribed h[er] Zometa. [She] took this medication from May or June of 2003 until October of 2004.  As a result, [s]he suffered osteonecrosis of the jaw and was diagnosed in January of 2005. [¶] 02. Defendant NOVARTIS PHARMACEUTICAL CORPORATION ('Novartis') is a Delaware corporation with its principal place of business located at One Health Plaza, East Hanover, New Jersey 07936-1080. [¶] 04. During all times relevant hereto, NOVARTIS was in the business of manufacturing, marketing, distributing, promoting, testing, labeling and selling Zometa."

Plaintiff further alleged:

> "07.  Taking Zometa increases the risk of osteonecrosis of the jaw, including the maxillar (bone) . . . . Novartis made labeling changes in September and October of 2003, but these changes were inadequate to warn consumers and remain so to this date.  [¶] 09. . . . Plaintiff was taking Zometa in a reasonably foreseeable manner. [¶] 10. Zometa reached [her] without a substantial change in condition. [¶] 11. [She] was not aware of and reasonably could not have discovered the specific danger of severe osteonecrosis associated with the use of Zometa.  [¶] . . . [¶] 14. To this day, NOVARTIS has not warned dentists across the nation of this danger or how to monitor and treat patients who took Zometa as prescribed.  Therefore, the Plaintiff . . . seeks imposition of punitive damages . . . ."

On July 18, 2006, defendant Novartis Pharmaceutical Corporation (hereinafter referred to as "Defendant") removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a) and 1446(a).

On January 6, 2012, Defendant filed its motion to apply New Jersey law, vice California law, to Plaintiff's request for punitive damages.  On February 6, 2012, Plaintiff filed her opposition to Defendant's motion.  On February 20, 2012, Defendant filed its reply to Plaintiff's opposition.

**III. LEGAL STANDARD**

"To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum."  *Narayan v. EGL, Inc.,* 616 F.3d 895, 898 (9th Cir. 2010) (citing *Fields v. Legacy Health Sys.,* 413 F.3d 943, 950 (9th Cir. 2005)).  When two states are potentially interested in having their laws applied, California courts employ a governmental interest analysis to determine possible conflicts of law for issues not governed by contractual choice of law provisions.  *Smith v. Cimmet,* 199 Cal.App.4th 1381, 1495, 132 Cal.Rptr.3d 276 (2011); *see Bernhard v. Harrah's Club,*

16 Cal.3d 313, 316, 128 Cal.Rptr. 215, 546 P.2d 719 (1976) (superseded by statute on other ground as stated in *Cory v. Shierloh,* 29 Cal.3d 430, 434, 174 Cal.Rptr. 500, 629 P.2d 8 (1981)); *Hurtado v. Superior Court,* 11 Cal.3d 574, 580-81, 114 Cal.Rptr. 106, 522 P.2d 666 (1974). "The first step in the governmental interest analysis is to determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ.  If there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law." *Frontier Oil Corp. v. RLI Ins. Co.,* 153 Cal.App.4th 1436, 1465, 63 Cal.Rptr.3d 816 (2007) (citing *Washington Mutual Bank, FA v. Superior Court of Orange County,* 24 Cal.4th 906, 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (2001) (*Briseno*)) (internal citations omitted).[1]  "If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute.  If each jurisdiction has an interest in applying its own law to the issue, there is a 'true conflict' and the court must proceed to the third step.  In the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue or, conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied.  The court must apply the law of the jurisdiction whose interest would be more significantly impaired if its law were not applied." *Id.* at 1456 (citing *Kearney v. Salomon Smith Barney, Inc.,* 39 Cal.4th 95,

---

[1] The Supreme Court has held that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312-13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981); *accord Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818-22, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (to apply its substantive law to a nationwide class action without violating the Due Process and Full Faith and Credit Clauses of the Constitution, a state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [state] law is not arbitrary or unfair").  Thus, before a court engages in the governmental interest analysis, it must find the forum state has significant contacts to the claims of the plaintiff such that the state's law may be constitutionally applied. *Briseno, supra,* 24 Cal.4th at 817.  Plaintiff contends – and Defendant does not dispute – California has the requisite contacts to Plaintiff's claims.  In fact, Defendant essentially concedes the contacts by agreeing California law applies to issues of substantive liability.

3

1   107-108, 45 Cal.Rptr.3d 730, 137 P.3d 914 (2006) and *Briseno, supra,* 24 Cal.4th at 919-20).

2

3                                    **IV. DISCUSSION**

4

5   *A. Step 1: The applicable laws of California and New Jersey differ materially as to punitive*

6   *damages* – Having reviewed the pleadings of record and all competent and admissible evidence

7   submitted, the Court first finds the applicable laws of California and New Jersey differ materially

8   as to punitive damages.  In California, punitive damages are available in any action for breach of a

9   non-contractual obligation – including products liability actions (*see Grimshaw v. Ford Motor*

10  *Company,* 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981); *Toole v. Richardson-Merrell Inc.,* 251

11  Cal.App.2d 689, 60 Cal.Rptr. 398 (1967)) – "where it is proven by clear and convincing evidence

12  that the defendant has been guilty of oppression, fraud, or malice[.]"  Cal. Civ. Code, § 3294, subd.

13  (a).  California statutes limit the amount of punitive damages that may be awarded for certain causes

14  of action.  *See, e.g.,* Cal. Civ. Code, § 3426.3, subd. (c) (limiting punitive damages for

15  misappropriation of trade secrets to twice compensatory damages)).  However, punitive damages

16  awards in products liability actions are not statutorily limited, although, as with any award of

17  punitive damages, they are nonetheless subject to the Due Process Clause of the Fourteenth

18  Amendment (*State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155

19  L.Ed.2d 585 (2003); *see Roby v. McKesson Corp.,* 47 Cal.4th 686, 712, 101 Cal.Rptr.3d 773, 219

20  P.3d 749 (2009)) and the limitation they be sufficient to "deter future misconduct by the defendant"

21  without being "so disproportionate to the defendant's ability to pay that the award is excessive[.]"

22  *Adams v. Murakami,* 54 Cal.3d 105, 110-12, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991).

23      The New Jersey Punitive Damages Act (NJPDA), like California Civil Code § 3294, provides

24  for punitive damages "only if the plaintiff proves, by clear and convincing evidence, that the harm

25  suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated

26  by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might

27

28                                         4

be harmed by those acts or omissions." N.J. Stat. Ann. § 2A:15-5.12, subd. (a).  But in contrast to California, New Jersey limits punitive damages "*in any action* in an amount in excess of five times the liability of the defendant for compensatory damages or $350,000, whichever is greater,"  N.J. Stat. Ann. § 2A:15-5.14, subd. (b) (emphasis added).  In addition, the New Jersey Products Liability Act (NJPLA, N.J. Stat. Ann. §§ 2A:58C-1 to -7) prohibits punitive damages where "a drug . . . which caused the claimant's harm was subject to premarket approval or licensure by the federal Food and Drug Administration [FDA] . . . and was approved or licensed," N.J. Stat. Ann. § 2A:58C-5, subd. (c).  The NJPLA does provide an exception for punitive damages, but only "where the product manufacturer knowingly withheld or misrepresented information required to be submitted under the [FDA]'s regulations, which information was material and relevant to the harm in question," a burden of proof different than the burden imposed under section 3294.[2]  *Id.*  The parties do not dispute that Zometa is an FDA-approved drug.  Therefore, if New Jersey law were to apply here, any award of punitive damages against Defendant would effectively be subject to limitations inconsistent with those contemplated under California law.  Under these circumstances, there is clearly a material difference between California and New Jersey law as to punitive damages.

***B. Step 2: There is a true conflict between California and New Jersey law*** – Because the punitive damages laws of California and New Jersey differ materially, the Court proceeds to examine the interests of each jurisdiction in having its own law applied to the dispute to determine whether there is a true conflict.  "Despite materially different laws, 'there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied.'

---

[2] In *McDarby v. Merck & Co., Inc.,* 401 N.J.Super. 10, 949 A.2d 223 (2008), the Appellate Division of the New Jersey Superior Court, relying principally on *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), which held that "state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law," found the exception to be preempted by FDA regulations.  *Id.* at 94.  The holding of *McDarby*, however, has been called into doubt by *Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) and *Forman v. Novartis Pharmaceuticals Corp.,* 793 F.Supp.2d 598 (E.D.N.Y. 2011).

[Citations.] This means the trial court may properly find California law applicable without proceeding to the third step in the analysis if the foreign law proponent fails to identify any actual conflict or to establish the other state's interest in having its own law applied. [Citations.]" *Briseno, supra,* 24 Cal.4th at 920. "If the interests of the foreign state will not be significantly furthered by applying its law, the California court must conclude that the conflict is 'false' and apply California law." *American Bank of Commerce v. Corondoni,* 169 Cal.App.3d 368, 372, 215 Cal.Rptr. 331 (1985) (citing *Hurtado, supra,* 11 Cal.3d at 580). "Only if the trial court determines that the laws are materially different *and* that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be 'more impaired' if its laws were not applied. [Citations.]" *Briseno, supra,* 24 Cal.4th at 920 (emphasis original). Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court finds both California and New Jersey have an interest in having their laws applied. Because their laws are materially different, a true conflict results.

California's punitive damages law advances the state's legitimate interests in punishing and deterring conduct harmful to its residents. *Simon v. San Paolo U.S. Holding Co., Inc.,* 35 Cal.4th 1159, 1185, 29 Cal.Rptr.3d 379, 113 P.3d 63 (2005). "The United States Supreme Court has consistently recognized that punitive damages serve the twin goals of punishment and deterrence." *Bardis v. Oates,* 119 Cal.App.4th 1, 26, 14 Cal.Rptr.3d 89 (2004) (citing *Campbell, supra,* 538 U.S. at 416 ("[P]unitive damages serve a broader function; they are aimed at deterrence and retribution") and *BMW of North America, Inc., v. Gore,* 517 U.S. 559, 569, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition")). California recognizes these interests in permitting recovery of punitive damages "for the sake of example and by way of punishing the defendant," Cal. Civ. Code, § 3294, subd. (a)), and "California law has long endorsed the use of punitive damages to deter continuation or imitation of a corporation's course of wrongful conduct." *Johnson v. Ford Motor Company,* 35 Cal.4th 1191, 1207, 29 Cal.Rptr.3d 401, 113 P.3d 82 (2005);

6

*see Simon, supra,* 35 Cal.4th at 1185.  Perhaps nowhere is this clearer than in the punitive damages jurisprudence established by California courts in products liability actions.  *See Johnson, supra,* 35 Cal.4th 1191; *Bullock v. Phillip Morris USA, Inc.,* 198 Cal.App.4th 543, 565-73, 131 Cal.Rptr.3d 382 (2011); *Romo v. Ford Motor Co.,* 113 Cal.App.4th 738, 746-52, 6 Cal.Rptr.3d 793 (2003).

New Jersey also recognizes that the purposes of punitive damages are "the deterrence of egregious misconduct and the punishment of the offender."  *Herman v. Sunshine Chemical Specialties, Inc.,* 133 N.J. 329, 337, 627 A.2d 1081 (1993) (citing *Leimgruber v. Claridge Assocs., Ltd.,* 73 N.J. 450, 454, 375 A.2d 652 (1977)).  However, unlike California, New Jersey places less emphasis on the deterrence aspect.  *See Tarr v. Bob Ciasulli's Mack Auto Mall, Inc.,* 390 N.J.Super. 557, 565-69, 916 A.2d 484 (2007); compare *Romo, supra,* 113 Cal.App.4th at 745-50.  Furthermore, by imposing numerical limits on the amount of punitive damages recoverable in all actions, New Jersey law reflects an additional interest in encouraging economic activity in the state and in protecting defendants from excessive liability.  This interest is especially apparent in actions that, if brought in New Jersey, would implicate the NJPLA's prohibition on punitive damages where the plaintiff's injury was caused by FDA-approved pharmaceuticals: " 'The Legislature intended for the [NJPLA] to limit the liability of manufacturers so as to "balance[ ] the interests of the public and the individual with a view towards economic reality." ' [Citations.] . . . [¶] . . . [¶] The predominant object of the law is not to encourage tort recoveries by plaintiffs, whether New Jersey citizens or not, in order to deter this State's drug manufacturers.  On the contrary, the law limits the liability of manufacturers of FDA-approved products by reducing the burden placed on them by product liability litigation.  The Legislature carefully balanced the need to protect individuals against the need to protect an industry with a significant relationship to [New Jersey's] economy and public health." *Rowe v. Hoffman-La Roche, Inc.,* 189 N.J. 615, 623-24, 626, 917 A.2d 767 (2007).

In the complaint, Plaintiff alleges she was a resident of California at the time of Defendant's misconduct, and further alleges she suffered injury in California.  Plaintiff also contends – and Defendant does not dispute – that Zometa is marketed and sold in California, and that beginning in

May 2003, Plaintiff was prescribed Zometa by California doctors and received some of her infusions in California.  Therefore, California, as the forum state, has an interest in applying its (relatively more generous) punitive damages law to punish and deter misconduct harmful to Plaintiff.  New Jersey, on the other hand, has an interest in limiting the liability of businesses that operate within its borders.  Thus, because Defendant's principal place of business is in New Jersey, New Jersey has an interest in applying its (relatively more restrictive) punitive damages law to limit liability to Defendant.  If New Jersey's law were to apply, California's interest in punishment and deterrence would be impaired.  *See, e.g., Wong v. Tenneco, Inc.,* 39 Cal.3d 126, 143, 216 Cal.Rptr. 412, 702 P.2d 570 (1985) (application of Mexican law preserving domestic farm ownership and control of natural resources would impair California's interest in "affording relief to its citizens who have suffered a breach of contract or a tort . . . and of punishing and deterring wrongful conduct").  If California's law were to apply, New Jersey's policy interests would be impaired.  *See, e.g., In re Mercedes-Benz Tele Aid Contract Litigation,* 257 F.R.D. 46, 68 (D.N.J. 2009) ("New Jersey's interest in limiting the liability of a corporation headquartered within its borders – an interest which is implicit in the fact that 'the only form of punitive damages expressly allowed by the [New Jersey Consumer Fraud Act] are treble damages,' [citation] – would be compromised if the company were subjected to the law of states that do not limit punitive recovery in consumer fraud cases").  Given the material differences between the respective laws, and the fact that each state's interests would be subordinated by application of the other's law, the Court is presented with a true conflict.[3]

---

[3] New Jersey's interest in promoting economic activity and protecting businesses from excessive liability is not the sole interest underlying the NJPLA.  In *Rowe, supra,* 189 N.J. 615, the New Jersey Supreme Court acknowledged that even though the NJPLA limits the liability of drug manufacturers by "ced[ing] to FDA regulation some of this State's interest in policing local pharmaceutical manufacturers," the fact the statute does not preclude all actions premised on a failure to warn but "create[s] only a rebuttable presumption of adequacy for FDA approval of prescription drug warnings" – thereby allowing plaintiffs to conceivably maintain a cause of action against a manufacturer for injuries arising out of the use of FDA-approved drugs – showed the New Jersey Legislature was also "interest[ed] in ensuring . . . corporations are deterred from producing unsafe products." *Id.* at 624-26 (citing N.J. Stat. Ann. §§ 2A:58C-4, -5), 629.  If deterrence were the "predominant object" expressed by the NJPLA, any asserted conflict between California and New

1

2   ***C. Step 3: California has a greater interest than New Jersey in the application of its own law, and***

3   ***California's interest would be more significantly impaired if its law were not applied*** – Because

4   there is a true conflict, the Court proceeds to the third and final step, the comparative impairment

5   analysis, to determine whether California or New Jersey has a greater interest in the application of

6   its own law, or which state's interest would be more significantly impaired if its law were not

7   applied.  "[T]his analysis does not involve the court in 'weighing' the conflicting governmental

8   interests 'in the sense of determining which conflicting law manifest[s] the "better" or the "worthier"

9   social policy on the specific issue.  An attempted balancing of conflicting state policies in that sense

10  . . . . is difficult to justify in the context of a federal system in which, within constitutional limits,

11  states are empowered to mold their policies as they wish.' [¶] Rather, the resolution of true conflict

12  cases may be described as 'essentially a process of allocating respective spheres of lawmaking

13  influence.' "  *Offshore Rental Co. v. Continental Oil Co.,* 22 Cal.3d 157, 165, 148 Cal.Rptr. 867, 583

14  P.2d 721 (1978) (internal citations omitted).  "The process of allocation demands several inquiries."

15  *Id*.  First, the court should consider whether the policy underlying a state's law was more strongly

16  held in the past than at present.  *Id*.  Second, the court should consider " '[i]f one of the competing

17  laws is archaic and isolated in the context of the laws of the federal union.' "  *Id*. (emphasis omitted).

18  If so, "it may not unreasonably have to yield to the more prevalent and progressive law, other factors

19  of choice being roughly equal."  *Id*. (emphasis omitted).  Third, the court should consider whether

20

21  _____

22  Jersey law would arguably be false, as application of California's less manufacturer-friendly punitive

    damages law would only serve to further this object.  *Rowe, supra,* 189 N.J. at 626.  Stated

23  differently, New Jersey would have little interest in applying its punitive damages law to reduce

    Plaintiff's potential recovery if the law were primarily intended to deter "because the likelihood of

24  a substantial recovery against . . . a manufacturer strengthens the deterrent effect." *Stangvik v. Shiley*

    *Incorporated,* 54 Cal.3d 744, 759, 1 Cal.Rptr.2d 556, 819 P.2d 14 (1991).  However, as noted above,

25  the predominant object of the NJPLA is not New Jersey's interest in deterrence, but its interest in

    "reducing the burden placed on [manufacturers] by product liability litigation." *Rowe, supra,* 189

26  N.J. at 626.  This interest is clearly at odds with California's interest in deterring the manufacture

    and distribution of unsafe products.  *See Grimshaw, supra,* 119 Cal.App.3d at 810.

27

28                                                          9

the law is "infrequently enforced or interpreted even within its own jurisdiction, and, [if so], should have a limited application in a conflicts case." *Id.* at 166. Lastly, the court should consider "the 'maximum attainment of underlying purpose by all governmental entities. This necessitates identifying the focal point of concern of the contending lawmaking groups and ascertaining the comparative pertinence of that concern to the immediate case' . . . . [¶] In sum, the comparative impairment approach to the resolution of true conflicts attempts to determine the relative commitment of the respective states to the laws involved." *Id.* (emphasis omitted). Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court, applying the foregoing principles, finds California has a greater interest than New Jersey in the application of its law, and that interest would be more significantly impaired if its law were not applied.

In undertaking the process of allocation, the Court first observes that "[p]unitive damages are not a new phenomenon. They have been part of our common law tradition for more than two centuries. Allowed in almost every state in certain cases, they have been part of [California's] Civil Code since 1872." *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.,* 155 Cal.App.3d 381, 387, 202 Cal.Rptr. 204 (1984) (internal citations omitted). In California, the availability of punitive damages actually predates their codification in California Civil Code § 3294. As early as 1852, just two years after California achieved statehood, the California Supreme Court, in upholding a trial court's denial of a motion for new trial, implicitly held that a jury had a right to award punitive damages in any personal injury action for which the defendant could also have been convicted in a criminal proceeding. *Wilson v. Middleton,* 2 Cal. 54, 54-56 (1852). And in *Moody v. McDonald,* 4 Cal. 297 (1854), the court, in reversing a punitive damages award in a simple negligence action, first drew a distinction between the purposes of compensatory and punitive damages. But while California's punitive damages law has an antiquated provenance, the policies underlying the law – punishment and deterrence of wrongful conduct – are held just as strongly today as they were in the past. *See Roby, supra,* 47 Cal.4th at 719-20. In addition, the law can hardly be said to be "archaic and isolated in the context of the laws of the federal union." *Offshore Rental, supra,* 22 Cal.3d at 165. As noted

above, punitive damages are recoverable in nearly all the states for one reason or another; only "a few [s]tates award them rarely, or not at all." *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 495, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008). The Court further notes section 3294 has been amended seven times since its enactment: first in 1905, then in 1980, 1982, 1983, 1987, 1988 and, most recently, in 1992. Cal. Civ. Code, § 3294, as amended by Stats.1905, ch. 463, § 1; Stats.1980, ch. 1242, § 1; Stats.1982, ch. 174, § 1; Stats.1983, ch. 408, § 1; Stats.1987, ch. 1498, § 5; Stats.1988, ch. 160, § 17; Stats.1992, ch. 178, § 5; cf. *College Hospital, Inc. v. Superior Court,* 8 Cal.4th 704, 712-13, 34 Cal.Rptr.2d 898, 882 P.2d 894 (1994) (summarizing amendments). In the Court's view, this reflects the California Legislature's recent and renewed interest in refinement of the statute. Nor can it be said that California's punitive damages law is "infrequently enforced or interpreted" such that it "should have a limited application in a conflicts case." *Offshore Rental, supra,* 22 Cal.3d at 165. To the contrary, California courts "repeatedly have invoked and vigorously enforced," *Kearney, supra,* 39 Cal.4th at 125, section 3294. *See, e.g., Bullock, supra,* 198 Cal.App.4th 543; *Century Surety Company v. Polisso,* 139 Cal.App.4th 922, 963-66; 43 Cal.Rptr.3d 468 (2006); *Roman Catholic Bishop of Oakland v. Superior Court,* 128 Cal.App.4th 1155, 28 Cal.Rptr.3d 355 (2005); *Boeken v. Phillip Morris Inc.,* 127 Cal.App.4th 1640, 1688-1704, 26 Cal.Rptr.3d 638 (2005).

The NJPLA is perhaps as "prevalent and progressive," *Offshore Rental, supra,* 22 Cal.3d at 165, as California's punitive damages law. The policy underlying the NJPLA is as strongly held today as it ever has been. As the New Jersey Supreme Court recently reiterated in *Kendall v. Hoffman-La Roche, Inc.,* 36 A.3d 541 (2012), the law "was enacted as a remedial measure to limit the liability of manufacturers by establishing 'clear rules with respect to certain matters . . . including certain principles under which liability is imposed and the standards and procedures for the award of punitive damages.'[4] In particular, in enacting the [NJPLA], the Legislature intended to reduce the

---

[4] This general interest in ensuring predictability of result has been recognized even by the California Supreme Court. *See McCann v. Foster Wheeler,* 48 Cal.4th 68, 98, 105 Cal.Rptr.3d 378, 225 P.3d 516 (2010) (observing that every jurisdiction has an interest "in being able to assure individuals and commercial entities operating within its territory that applicable limitations on

1    burden on manufacturers of FDA-approved products resulting from products liability litigation."

2    *Id*. at 11 (internal citations omitted); *see* N.J. Stat. Ann. § 2A:58C-1, subd. (a).  Because the law is

3    further aimed at promoting New Jersey's interest in economic well-being, *see Rowe, supra,* 189 N.J.

4    at 626, it is also neither archaic nor isolated.  In *Mazza v. American Honda Motor Company, Inc.,*

5    666 F.3d 581 (9th Cir. 2012), the Ninth Circuit observed that every state legitimately has such an

6    interest, which it may advance through liability-limiting provisions such as those of the NJPLA.  *Id.*

7    at 592 ("In our federal system, states may permissibly differ to the extent to which they will tolerate

8    a degree of lessened protection for consumers to create a more favorable business climate for the

9    companies that the state seeks to attract to do business in the state . . . . [E]ach state has an interest

10   in setting the appropriate level of liability for companies conducting business within its territory. [¶]

11   Maximizing consumer and business welfare, and achieving the correct baseline for society, does not

12   inexorably favor greater consumer protection; instead, setting a baseline of corporate liability for

13   consumer harm requires balancing the competing interests").  The Court further observes the NJPLA

14   has frequently been enforced and interpreted by courts in New Jersey.  *See, e.g., Kendall, supra,* 36

15   A.3d 541; *Kury v. Abbott Laboratories, Inc.,* slip copy, 2012 WL 124026 (D.N.J. January 17, 2012),

16   at *3-*7; *Gupta v. Asha Enterprises, LLC,* 422 N.J.Super. 136, 144-46, 27 A.3d 953 (2011).

17          The results of the first three inquiries in the allocation process reveal both jurisdictions have

18   a strong and continued interest in the development and application of their respective laws, and thus

19   appear to favor neither jurisdiction.  Consequently, the impairment analysis turns on the fourth and

20   final consideration – "the maximum attainment of underlying purpose by all governmental entities,"

21   *Offshore Rental, supra,* 22 Cal.3d at 165.  In determining whether application of California or New

22   Jersey law will better achieve such attainment of purpose, the Court is guided by the following

23   principle: "[W]hen the forum state undertakes its 'search to find the proper law to apply based upon

24   the interests of the litigants and the involved states' [citation], it is understood that '(n)ormally, even

25

26   liability set forth in the jurisdiction's law will be available to those individuals and businesses in the

27   event they are faced with litigation in the future").

28                                                       12

in cases involving foreign elements, the court should be expected, as a matter of course, to apply the rule of decision found in the law of the forum.' [Citation.]" *Hurtado, supra,* 11 Cal.3d at 581 (quoting, *inter alia*, *Reich v. Purcell,* 67 Cal.3d 551, 553, 63 Cal.Rptr. 31, 432 P.2d 727 (1967)). "The law of the forum, 'will be displaced only if there is a compelling reason for doing so.' It is 'applicable unless either the plaintiff or the defendant has been forced into a forum devoid of any such contact as would justify application of its own law.' [Citations.]" *Kasel v. Remington Arms Company, Inc.,* 24 Cal.App.3d 711, 731, 101 Cal.Rptr. 314 (1972). California is where Plaintiff's injury allegedly occurred. Plaintiff was a resident of California at the time of the alleged misconduct. As noted above, Plaintiff further contends – and Defendant does not dispute – Defendant markets, distributes and sells Zometa in California; Plaintiff was prescribed Zometa by a California physician; and Plaintiff was treated with Zometa in California. The case has a connection to New Jersey only inasmuch as it happens to be Defendant's principal place of business. On these facts alone, the case's contact to California is sufficient to justify application of California law. Thus, California law presumptively applies unless Defendant can present a compelling reason why it should not.

Defendant first contends New Jersey should be allocated "predominant lawmaking power" because the conduct sought to be regulated through an award of punitive damages – Defendant's manufacturing, distribution and sale of Zometa, and its alleged failure to warn of risks inherent in the drug – arose out of corporate decisions made primarily at Defendant's New Jersey headquarters. The Court does not agree. Some of Defendant's misconduct undoubtedly occurred in New Jersey. Whether the misconduct occurred primarily in New Jersey, however, is not discernible from the pleadings or the competent and admissible evidence submitted by the parties. What *is* discernible is the misconduct extends into California. Plaintiff alleges Defendant "markets Zometa to physicians in California," "distributes and sells Zometa . . . in California," "compensates agents who 'pitch' the drug to doctors . . . in California" and "sends instructional materials about the drug . . . to patients and physicians in California." Plaintiff further alleges Defendant failed to communicate the known risks of Zometa to doctors and patients in California. Under these circumstances, Defendant's

1    misconduct arguably occurred as much in California as in New Jersey, if not more so.

2           Even if the Court were to accept Defendant's proposition that the conduct giving rise to

3    punitive damages originated in New Jersey, "California recognizes that '*with respect to regulating*

4    *or affecting conduct within its borders*,' " that is, with respect to the issue of punitive damages, "the

5    place of the wrong has the predominant interest,' " and "California considers the 'place of the wrong'

6    to be the state where the last event necessary to make the actor liable occurred." *Mazza, supra,* 666

7    F.3d at 593 (quoting *Hernandez v. Burger,* 102 Cal.App.3d 795, 802, 162 Cal.Rptr. 564 (1980) and

8    *McCann, supra,* 48 Cal.4th at 94 n. 12) (emphasis added).   "The elements of a strict products

9    liability cause of action are a defect in the manufacture or design of the product or a failure to warn,

10   causation, *and injury*." *County of Santa Clara v. Atlantic Richfield Co.,* 137 Cal.App.4th 292, 318,

11   40 Cal.Rptr.3d 313 (2006) (citing *Soule v. General Motors Corp.,* 8 Cal.4th 548, 560, 34 Cal.Rptr.2d

12   607, 882 P.2d 298 (1994)) (emphasis added).   The last event necessary to make Defendant liable –

13   Plaintiff's injury – allegedly occurred in California.   Thus, California – as the place where Zometa

14   was prescribed to and injured one of its residents – has the predominant interest in having its law

15   applied.   Defendant also appears to be registered with the California Secretary of State for the

16   purpose of doing business in California.   This further suggests California has the greater interest.

17   *See North American Asbestos Corp. v. Superior Court,* 180 Cal.App.3d 902, 907, 225 Cal.Rptr. 877

18   (1986) ("[Defendant] was licensed for the transaction of intrastate business in California under a

19   certificate of qualification . . . . Although this in itself is not a basis for maintaining the present action

20   . . . , it is a factor in determining California's interest in applying its laws.   When a person suffers

21   injury in California as a result of business conducted by a foreign corporation then qualified to do

22   business within the state, California has a legitimate interest that the foreign corporation not be

23   permitted to avoid responsibility for its wrongful act . . . .").

24          Defendant further emphasizes the general interest, alluded to in *Rowe*, *supra*, 189 N.J. 623-

25   24, that New Jersey has in promoting economic activity within its borders, attracting corporations

26   and protecting those corporations whose principal places of business are located in the state, and

27

28                                                    14

contends that to apply California law here would substantially impair this interest. Problematically for Defendant, where, as here, a litigant "invokes the law of a foreign state[,] . . . he must demonstrate that the . . . rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." *Hurtado, supra,* 11 Cal.3d at 581 (internal citations omitted). In other words, "the burden is on the party seeking to invoke foreign law." *McGhee v. Arabian American Oil Company,* 871 F.2d 1412, 1422 (9th Cir. 1989). Defendant has failed to meet this burden. Shielding corporations from excessive liability *in New Jersey* would undeniably advance New Jersey's economic interest. Defendant, however, has provided no argument or evidence to explain how New Jersey's interest would be advanced by shielding corporations from excessive liability *in other states*. If, as Defendant suggests, New Jersey's interest lies in attracting companies *to New Jersey* and providing them with a favorable business climate *in New Jersey*, the fact those companies could potentially be subject to punitive liability *in other states* does not make *New Jersey* an any less attractive place to do business. If anything, it makes New Jersey a more attractive place to do business by comparison. In any case, Plaintiff is seeking to hold Defendant liable only in California. There are presumably plenty of other states over which New Jersey holds an advantage simply because of its law. One might argue that shielding New Jersey corporations from excessive liability in all jurisdictions would help preserve their financial health, thereby preserving New Jersey's economic welfare in the process. But Defendant has provided no evidence to show New Jersey's interest in economic welfare would be significantly impaired if California's punitive damages law were to apply here. The extent to which New Jersey's interest would be impaired if California law applied is speculative at best.

*Bernhard, supra,* 16 Cal.3d 313, is instructive as to why. The defendant Harrah's Club (Harrah's), a Nevada corporation with gambling establishments in Nevada, had advertised to and solicited the business of California residents in California. *Id*. at 315. In 1971, Fern and Philip Myers, California residents, drove from California to one of Harrah's gambling and drinking clubs in Nevada, where they "were served numerous alcoholic beverages by defendant's employees,

15

progressively reaching a point of obvious intoxication rendering them incapable of safely driving a car." *Id*. Despite the Myers' obvious intoxication, Harrah's employees continued to furnish them with alcohol. *Id*. The Myers then drove back to California, where they collided with a motorcycle ridden by Richard Bernhard, also a California resident. Bernhard subsequently brought an action against Harrah's, alleging his injuries were proximately caused by Harrah's negligence in furnishing alcohol to the Myers. The trial court sustained Harrah's demurrer to the complaint without leave to amend and dismissed the case, and the California Supreme Court reversed. *Id*. at 316.

On demurrer, Harrah's had successfully argued for application of Nevada law immunizing tavern keepers from liability for injuries to third parties proximately caused by the sale or furnishing of alcoholic beverages to intoxicated patrons, contending Nevada law (as opposed to California's law imposing liability) controlled because its alleged misconduct occurred in Nevada. *Bernhard, supra,* 16 Cal.3d at 316. This argument was essentially reiterated on appeal, with Harrah's further contending Nevada had "a definite interest in having its rule of decision applied in this case in order to protect its resident tavern keepers like defendant from being subjected to a civil liability which Nevada has not imposed either by legislative enactment or decisional law." *Id*. at 318. Finding each state had an interest in applying its law and that there was true conflict, the court concluded California's interest would have been substantially impaired if its law were not applied. The court then explained why Nevada's contrary interest would not have been significantly impaired: "Since the act of selling alcoholic beverages to obviously intoxicated persons is already proscribed in Nevada, the application of California's rule of civil liability would not impose an entirely new duty requiring the ability to distinguish between California residents and other patrons. Rather, the imposition of such liability involves an increased economic exposure, which, at least for businesses which actively solicit extensive California patronage, is a foreseeable and coverable business expense. Moreover, Nevada's interest in protecting its tavern keepers from civil liability of a boundless and unrestricted nature will not be significantly impaired when as in the instant case liability is imposed only on those tavern keepers who actively solicit California business." *Id.* at 323.

Just as the Nevada law of non-liability at issue in *Bernhard* did not abrogate Nevada's general prohibition on the sale of alcohol to obviously intoxicated persons, the NJPLA does not abrogate common law products liability in New Jersey. As the New Jersey Supreme Court noted in *Kendall, supra,* "[t]he [NJPLA] was not intended to codify all issues relating to product liability, [citation], and basic common law principles of negligence and strict liability remain intact[.]" 36 A.3d at 554. More importantly, punitive damages remain recoverable against a manufacturer in New Jersey, *see, e.g.,* N.J. Stat. Ann. § 2A:58C-5; the NJPLA merely "sets new limits on liability and punitive damages." *Kendall, supra,* 36 A.3d at 554. Thus, applying California's punitive damages law would not impose an entirely new rule of punitive liability on Defendant. Its effect would be to raise the upper limit on any potential award of punitive damages. But this "increased economic exposure," as the *Bernhard* court recognized, is nothing more than the cost of doing business. *Bernhard, supra,* 16 Cal.3d at 323. For a corporation such as Defendant, who, like Harrah's, is alleged to have actively solicited business in California, the risk of such exposure is "foreseeable and coverable." *Id*. The fact Defendant's potential exposure is a coverable one suggests the policy underlying the NJPLA (i.e., New Jersey's interest in protecting manufacturers from excessive liability) is less comparatively pertinent to the case at hand. That is to say, New Jersey's interest in protecting manufacturers from excessive liability, which the state effectuates through the NJPLA, could just as easily be effectuated if corporations like Defendant were to cover themselves. *See Offshore Rental, supra,* 22 Cal.3d at 166 ("[T]he policy underlying a statute may . . . be less 'comparatively pertinent' if the same policy may easily be satisfied by some means other than enforcement of the statute itself. Insurance, for example, may satisfy the underlying purpose of a statute originally intended to prove compensation to tort victims. The fact that parties may reasonably be expected to plan their transactions with insurance in mind may therefore constitute a relevant element in the resolution of a true conflict").[5] Furthermore, like the Nevada interest

---

[5] The Court notes that in this case, "coverable" is not synonymous with "insurable": Defendant's "cover" would have to involve something other than insurance because insurers may

1    implicated in *Bernhard*, New Jersey's interest in protecting its corporations will not be significantly

2    impaired because Plaintiff is seeking to hold Defendant liable only for misconduct occurring out of

3    the solicitation of California business.  Defendant and other corporations with their principal places

4    of business in New Jersey are presumably free to do business in forty-eight other states without the

5    specter of being held punitively liable under California law for their potential misconduct.

6          California's interest in punishment and deterrence, by contrast, would be significantly

7    impaired if New Jersey law were to apply here.  *Bernhard* is further instructive on this issue.  In

8    concluding California's interest would be more significantly impaired if its law were not applied in

9    that case, the *Bernhard* court reasoned: "Defendant by the course of its own chosen commercial

10   practice has put itself at the heart of California's regulatory interest, namely to prevent tavern keepers

11   from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California

12   in the intoxicated state.  It seems clear that California cannot reasonably effectuate its policy if it

13   does not extend its regulation to include out-of-state tavern keepers such as defendant who regularly

14   and purposely sell intoxicating beverages to California residents in places and under conditions in

15   which it is reasonably certain these residents will return to California and act therein while still in

16   an intoxicated state.  California's interest would be very significantly impaired if its policy were not

17   applied to defendant."  *Bernhard, supra,* 16 Cal.3d at 322-23.  Defendant, as with Harrah's, has

18   implicated California's regulatory interest through its chosen commercial practice.  Again, Plaintiff

19   alleges Defendant "markets Zometa to physicians in California," "distributes and sells Zometa . . .

20   in California," "compensates agents who 'pitch' the drug to doctors . . . in California" and "sends

21   instructional materials about the drug . . . to patients and physicians in California."  Plaintiff further

22   alleges Defendant knew about the risks of Zometa but failed to warn her and other users.  California

23   has an interest in regulating the conduct of manufacturers who, like Defendant, have allegedly placed

24   their products into California's stream of commerce with actual knowledge of a defect.  To preclude

25

26   not indemnify a defendant for direct punitive damages liability in California.  *PPG Industries, Inc.
     v. Transamerica Ins. Co.,* 20 Cal.4th 310, 84 Cal.Rptr.2d 455, 975 P.2d 652 (1999); *Stonewall*

27   *Surplus Lines Ins. Co. v. Johnson Controls,* 14 Cal.App.4th 637, 17 Cal.Rptr.2d 713 (1993).

28                                              18

the application of California's punitive damages law where such products have injured California residents in California would necessarily defeat this interest, as it would allow manufacturers to do business in the state while preventing the state from punishing or deterring misconduct committed within its borders.  Defendant has not identified any method by which California could effectuate its policy of punishment and deterrence if its punitive damages law were not applied, which suggests California's law is more comparatively pertinent to the case at hand.  Thus, because California's law is more comparatively pertinent and New Jersey's less so, the Court further concludes "maximum attainment of underlying purpose" will be achieved by application of California law.

Defendant further contends that because the goal of punitive damages is not to compensate injured parties but to punish and deter wrongful conduct, application of New Jersey law would neither deprive Plaintiff of a right to compensation nor frustrate her expectation that California law would govern liability for her injuries.  Plaintiff's expectations, according to Defendant, would be fully addressed by an award of compensatory damages.  In the Court's view, Plaintiff's expectations have little relevance to the case at hand because the governmental interest analysis focuses on the states' interests, not the interests of the litigants.  To the extent Defendant intends to suggest California has an interest only in compensating its residents, not in regulating the conduct of foreign corporations, the Court need only refer Defendant to the numerous cases cited within this order expressing California's interest in the punishment and deterrence of corporate misconduct.

"[T]o the extent that expectations are relevant in deciding choice of law questions, it is the parties' expectations about what law will be applied . . . that counts."  *Lincolnshire Management, Inc. v. Seneca Insurance Company, Inc.,* 2002 WL 31058285 (Cal.App. 4 Dist. September 16, 2002), at *5 (unpublished).[6]  Defendant attempts to explain how application of New Jersey law would not be inconsistent with Plaintiff's expectations, but conveniently neglects to discuss its own expectations.  In the Court's view, Defendant, a multinational corporation that presumably does

---

[6] The Court may cite unpublished California appellate decisions as persuasive authority. *See Employers Ins. of Wausau v. Granite State Ins. Co.,* 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

19

business in all fifty states, cannot reasonably contend it expected New Jersey law to apply in all instances where a consumer was injured by its product.  Instead, as *Bernhard* suggests, Defendant should have "foresee[n]" (i.e., expected) the law of the state where the product was marketed to and injured the consumer – here, California – would govern.  *Bernhard, supra,* 16 Cal.3d at 323.

As a final point, Defendant, referring to Plaintiff's deposition testimony, suggests that because Plaintiff first received Zometa infusions in Washington, Washington law – which prohibits punitive damages "unless expressly authorized by the legislature," *Barr v. Interbay Citizens Bank of Tampa, Florida,* 96 Wash.2d 692, 699, 635 P.2d 441 (1981) – should apply.  Defendant has provided no authority – and the Court's research reveals no authority – to explain how any interests Washington *might have* here could conceivably outweigh the interests California *does have* here.  Cf. *Singh v. Edwards Lifesciences Corp.,* 151 Wash.App. 137, 143-48, 210 P.3d 337 (2009). Defendant has also not shown how any misconduct it may have committed in Washington negates the potential for punitive liability arising out of misconduct allegedly committed in California.

Accordingly, the Court finds California has a greater interest than New Jersey in the application of its own law, and California's interest would be more significantly impaired if its law were not applied.  Therefore, the Court will apply California's punitive damages law.

**V. DISPOSITION**

Based on the foregoing, the motion of defendant Novartis Pharmaceutical Corporation to apply New Jersey law to plaintiff Chris Hill's request for punitive damages is DENIED.

IT IS SO ORDERED.

Dated: _____March 20, 2012_____          _____

                                          CHIEF UNITED STATES DISTRICT JUDGE

20