UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
------------------------------------ x
CHRIS HILL,                          :
                                     :
            Plaintiff,               :      1:06-CV-00939-JSR-SAB
                                     :
            -v-                      :         MEMORANDUM
                                     :           ORDER
NOVARTIS PHARMACEUTICALS CORPORATION, :
                                     :
            Defendant.               :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        Pending before the Court are the motions in limine of defendant

Novartis Pharmaceuticals Corporation ("Novartis"). Having reviewed the

parties' written submissions and provided them with the opportunity

for oral argument, the Court grants the motions in part, denies them

in part, and reserves them in part.

        On June 29, 2006, plaintiff Chris Hill filed her complaint in

San Joaquin County Superior Court against defendants Novartis and "Does

1 through 20," asserting causes of action sounding in strict products

liability and in negligence, premised on an alleged failure to warn.

Specifically, Hill alleges that Novartis's failure to warn of risks

inherent in the use of Zometa, an FDA-approved drug developed and

manufactured by Novartis for the treatment of cancer, caused her to

suffer osteonecrosis of the jaw ("ONJ") after she received infusions

of the drug.  On July 18, 2006, Novartis removed the action to this Court

pursuant to 28 U.S.C. §§ 1332(a) and 1441(a).  The case was transferred

to the U.S. District Court for the Middle District of Tennessee for

consolidated pretrial management in In re: Aredia and Zometa Products

<u>Liability Litigation</u>, 3:06-MD-1760 (the "MDL") and remanded to this Court on July 26, 2011.  Trial of the action was originally set for February 26, 2013 before the Honorable Anthony W. Ishii, but then transferred to the undersigned Judge for trial starting June 10, 2013.

Although motions in limine are nowhere referred to in federal statutes or the Federal Rules of Civil Procedure, they are a judicial creation designed to expedite trials by allowing a court to rule on evidentiary issues well "before the evidence is actually offered." <u>Luce v. U.S.</u>, 469 U.S. 38, 40 n. 2 (1984).

While in some of the rulings that follow, evidence is excluded, no such ruling precludes the Court from reconsidering the exclusion of evidence at trial based on a showing of new circumstances, such as adversary counsel's "opening the door" through their own arguments or evidence, use of the evidence for impeachment in appropriate circumstances, and numerous other possibilities that are impossible to predict at this time. However, if counsel seek on such a basis to introduce evidence previously excluded by the following rulings, counsel must first approach the bench and make its proffer outside the presence of the jury. As for rulings made herein permitting the introduction of evidence as, say, relevant, no such ruling precludes adversary counsel from objecting at trial to the introduction of such evidence on other grounds, such as, for example, hearsay.

A. Novartis's motion in limine #1. Novartis's motion in limine #1 is an omnibus motion that calls upon the Court to address seven evidentiary issues:

1. Exclusion of emails from members of a panel of physicians and oral surgeons discussing edits to Novartis's draft white paper on osteonecrosis of the jaw. As a threshold matter, Novartis moves "to exclude as hearsay all e-mails from the non-[Novartis]-affiliated physicians and oral surgeons discussing suggested edits to a draft of a White Paper entitled Expert Panel Recommendations for the Prevention, Diagnosis, and Treatment of Osteonecrosis of the Jaws: June 2004 [ ]." Novartis argues that "[t]he White Paper was the product of two [Novartis] Advisory Boards, and was co-authored by external advisors, including Drs. Salvatore Ruggiero, Robert Marx, Mark Schubert, and Ana Hoff, among others. [Novartis] issued the final version of the White Paper in June 2004. During the drafting process of the White Paper, [Novartis] solicited comments from the members of the Advisory Board on various iterations of the draft White Paper. Some members responded by e-mail with comments."

Three emails are of particular concern to Novartis: (1) a May 12, 2004 email from Dr. Mark Schubert, a physician at the Seattle Cancer Care Alliance; (2) a May 28, 2004 email from Schubert; and (3) a May 12, 2004 email from Dr. Ana Hoff, a physician at the University of Texas MD Anderson Cancer Center in Houston.

3

They appear to contain criticisms of conclusions made about ONJ in the draft white paper. For example, in his May 12, 2004 email addressed to Hoff and Novartis employee YongJiang Hei, Schubert states:

> Page 2 (4- risk factors): Are these risk factors associated with [o]steoradionecrosis?  I don't know if we can say that the same risk factors will apply to [ ] this type of ON [sic] of the Jaw.  So, if these risks [sic] factors are the ones known to be associated with osteoradionecrosis, we should probably mention that ??? [¶] I BELIEVE WE HAD CONSENSUS ON DIRECT RISK FACTORS BEING EXTRACTIONS, INFECTION AND TRAUMA. THE LAUNDRY LIST OF FACTORS LEADING TO 'EXPOSED BONE' DOES HAVE THE APPEARANCE OF 'BLOWING SMOKE.'  CONSIDERATION OF OTHER FACTORS (I.E., THIS LONG LIST) COULD BE PRESENTED IN THE LIGHT OF, AS YOU SUGGEST, POSSIBLY OR POSSIBLY NOT RELATED TO THIS TIME OF ON [sic].  IT WOULD ALSO BE REASONABLE TO CLEARLY KEEP REINFORCING THE NEED FOR MORE RESEARCH."

And in his May 28, 2004 email addressed to Hei, Schubert states:

> Page 5, [¶] V.7.: 'To date, cessation of bisphosphonate therapy appears to have no effect on established osteonecrosis, but further study is clearly needed.' [the case I am managing that developed a lesion after the 2-3 doses of Zometa is showing healing after 3 months of being off . . . so . . . .] [¶] . . . [¶]  . . . I also think it is important to convey the idea that these lesions are not only seen in patients who have been on therapy for years – which the literature seems to indirectly imply.  I DO have a case where the lesion developed after 2 doses of Zometa and thus, the inclusion of my comments – he looked exactly like many of the lesions reported by Marx, Migliorati, and more recently, Ruggiero. [¶]  I can appreciate Novartis' desire to demonstrate clear caution about premature implication of bisphosphonates as a cause of these lesions, and, yes, while there likely will be found 'co-risk factors,' I think that any implication of trying to 'blow smoke' within these guidelines will not be perceived well by the medical/dental community.  I encourage you to take a bold and honest approach to realistically warn people ant [sic] this will, in the long run, be the best thing.  Patients have been and continue to access the information out there on this problem and they tend to be less kind to corporate protective posturing, plus they are the ones most likely to hire lawyers . . . ."

4

Firstly, in Hoff's May 12, 2004 email to Schubert, copying other individuals who were presumably members of the advisory board, she states that she agreed with the points raised in Schubert's May 12 email.

On the present record, the Court agrees that the emails must be excluded as hearsay, as they are out-of-court statements that would presumptively be offered by Hill to prove the truth of the matters asserted. See Fed. R. Evid. 801, 802. In her opposition, however, Hill contends the emails would be offered not for the truth of the matters asserted therein but to substantiate "the pattern and habit of [Novartis] regarding [ONJ]." But even assuming arguendo that pattern and practice can be proved by evidence that would otherwise be hearsay, Hill fails to explain what "pattern or practice" is evidenced by these few e-mails, what other evidence supports any asserted "pattern or practice," or what the relevance of any of this is. In short, she does not remotely meet the requirements of Federal Rule of Evidence 406 as to what constitutes legally admissible evidence of a pattern or practice.

Alternatively, Hill's counsel contends the emails should be admissible as the statements of a party opponent under Federal Rule of Evidence 801(d)(2). See Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1070 n. 8 (9th Cir. 2003). Rule 801(d) provides in pertinent part that "A statement that meets the following conditions is not hearsay: [¶] . . . [¶] (2) An Opposing Party's Statement. The statement

5

is offered against an opposing party and: [¶] . . . [¶] (D) was made

by the party's agent or employee on a matter within the scope of that

relationship and while it existed[.]" Fed. R. Evid. 801(d)(2)(D).  Hill

argues that "Drs. Hoff and Schubert . . . in the capacity of the e-mails

cited are clearly serving as advisors to the company . . . . The Advisory

Boards . . . were created to obtain and then disseminate accurate

evidence regarding [ONJ]."  Consequently, Hill argues, Hoff and

Schubert were agents or employees of Novartis and thus their emails

should are admissible party admissions.

But what Rule 801(d)(2)(D) requires, on its face, is agency.

An agency relationship arises when "both the principal and the agent

must manifest assent to the principal's right to control the agent."

United States v. Bonds, 608 F.3d 495, 506 (9th Cir. 2010). Here, there

is, at present, simply no evidence that would permit the Court to

conclude that Hoff and Schubert were agents (or employees) of Novartis,

let alone evidence to show that the emails related to matters within

the scope of their purported agency. The e-mails, on their face, do

not establish agency, not that that would obviously be sufficient in

any case. See Sea-Land Service, Inc. v. Lozen Intern., LLC, 285 F.3d

808, 821 (9th Cir. 2002) ("when a court is evaluating whether such a

foundation has been established, [t]he contents of the statement shall

be considered but are not alone sufficient to establish . . . the agency

or employment relationship and scope thereof."). And while it is true,

as Hill argues, that persons serving as "advisors" and "consultants" have sometimes been held to be agents, <u>see, e.g.</u>, <u>Tisa v. Beasley FM Acquisition Corp.</u>, 343 Fed.Appx. 793, 798 (3d Cir. 2009); <u>Beck v. Haik</u>, 377 F.3d 624, 638-40 (6th Cir. 2004), <u>overruled on other grounds</u>, <u>Adkins v. Wolever</u>, 554 F.3d 650, 651 (6th Cir. 2009); <u>Walden v. Seaworld Parks & Entertainment, Inc.</u>, slip op., 2012 WL 4050176, at *2 (E.D. Va. 2012), in none of these cases was it the fact of being an advisor or consultant that alone created the agency relationship.  The dispositive enquiries were still the agent's consent to act on behalf of the purported principal and the principal's right to control the actions of the agent. Where an advisor or a consultant "is not subject to the control of the party opponent with respect to consultation . . . he or she is hired to give, the [consultant] cannot be deemed an agent." <u>Kirk v. Raymark Industries, Inc.</u>, 61 F.3d 147, 164 (3d Cir. 1995).

Here the emails, if anything, refute the notion of agency. The fact Schubert and Hoff could criticize the draft white paper and propose changes to it suggests that their role was to provide an independent assessment and that Novartis did not have the right to control them. And aside from the emails themselves, Hill offers no other evidence of agency. While Schubert may have still been a member of the advisory board at the time he sent his emails, Hill has not shown he had any responsibilities or functions within Novartis other than simply recommending edits to the white paper in an advisory capacity.

The Court has also considered Hill's other arguments for admissibility of these three emails, and finds them unpersuasive. Accordingly, Novartis's motion in limine to exclude these three emails is granted. As for the other emails from the advisory board of physicians and oral surgeons discussing suggested edits to the draft of the white paper, they also are excluded as hearsay; but since they were not discussed in detail in the parties' briefing, this latter ruling is more open to reconsideration should Hill offer any particular such email or emails at the time of trial.

2. Exclusion of deposition testimony and videotaped presentation of Dr. Noopur Raje. The second prong of Novartis's omnibus motion asks the Court to exclude (1) the videotape of a presentation made at a medical symposium by Dr. Noopur Raje and (2) Raje's deposition testimony in the MDL.  In her opposition filed January 30, 2013, Hill represented to the Court she "will not use any testimony, live or otherwise, of Dr. Noopur Raje at trial unless [Novartis] opens the door to its admission."  Accordingly, this motion in limine is granted, on consent.

3. Exclusion of recommendations from the "Osteonecrosis of the Jaw" (ONJ) Advisory Panel. Novartis further moves to preclude the introduction of a document entitled "Recommendations from the 'Osteonecrosis of the Jaw' Advisory Panel," authored by M. Gall, Ph.D., which summarizes key points, recommendations and action items from a

March 16, 2005 meeting regarding ONJ within Novartis's Zoledronic Acid Bone Clinical Development Group.  Of particular concern to Novartis is Section 1.3.4.2.2 (Product Labeling), which states that "It was recommended that the proposed US package insert remove any statements that the risk factors for 'ONJ' are 'well documented.'" Novartis contends that this statement has no probative value because it was made in reference not to the labeling for Zometa, but to the labeling for Reclast, a drug that, although containing the same active ingredient as Zometa, is prescribed for entirely different conditions.  As support for this contention, Novartis directs the Court to a March 9, 2005 email from a Novartis employee named Ye Hua, which describes the tentative agenda for the March 16, 2005 meeting on ONJ.

The Court has reviewed Hua's email in its entirety and finds no support for Novartis's contentions. Hua's email says nothing about Reclast, and if anything, suggests the March 16 meeting likely involved discussions about Zometa and oral bisphosphonates. Novartis emphasizes Hua's statement that "[t]he purpose of the [March 16, 2005] meeting is to develop strategies to mitigate ONJ risks in zoledronic acid benign indications," (emphasis supplied), and then proceeds to argue that, because Zometa is not prescribed for benign indications, the recommendations made at the March 16 meeting necessarily would not have concerned Zometa.  But Novartis has proffered no evidence, as opposed to counsel's argument, that Zometa is never prescribed for benign

indications, and in the absence of such evidence, Novartis has failed to carry its burden. Accordingly, the Court denies this prong of Novartis's motion, without prejudice to renewal on a more adequate evidentiary foundation.

4. Exclusion of September 2005 statement of Dr. Jack Gotcher.

Novartis moves to exclude a statement allegedly made by Dr. Jack Gotcher. Citing the trial transcript in Fussman v. Novartis Pharmaceuticals Corporation, no. 1:06CV149 (M.D.N.C.), Novartis describes Gotcher's statement as follows:

> On September 21-24, 2005, during a symposium at the AAOMS annual meeting, Dr. Gotcher, an oral surgeon, addressed a panel discussing ONJ. Specifically, he remarked: [¶] 'I did a study with W.S.S. Jee. It was published in 1981 in the [J]ournal of [P]erio [R]esearch where we looked at experimental periodontal disease in the rice rat and we gave clodronate as a bisphosphonate and we were able to produce osteonecrosis at the high doses, which were 10 milligrams per kg day given over a long period of time.'

Novartis contends that the remarks should be excluded as inadmissible hearsay.

The Court notes that Gotcher did not actually testify that he made the foregoing remarks. Instead, the trial transcript excerpt provided by Novartis shows that another physician who was Gotcher's faculty colleague attributed the remarks to Gotcher. This, of course, makes the statement not only hearsay but double hearsay. Accordingly, the motion to exclude the statement is granted.

10

5. Exclusion of testimony and other evidence relating to "ghostwritten" articles. Novartis moves to preclude Hill from "introduc[ing] testimony or evidence that some or many of the articles concerning bisphosphonates in medical journals were actually 'ghostwritten' by drug companies, including [Novartis]." Having reviewed the parties' briefing and all competent and admissible evidence submitted, the Court agrees such evidence should be excluded.

In an order issued November 6, 2012, the Court granted Novartis's August 22, 2012 motion to preclude Hill's expert Dr. Suzanne Parisian from testifying on the issue of ghostwriting and company-funded publications. Although not explained in the Order, the Court was concerned that Parisian's opinion lacked a proper foundation. Hill also represented to the Court in her September 24, 2012 opposition to Novartis's August 22, 2012 motion that Parisian would not be questioned about this issue. In light of the foregoing, and the fact that the only expert who offered an opinion in his or her expert report about ghostwriting and company-funded publications was Parisian, this prong of Novartis's omnibus motion is granted.

6. Prohibition of Hill's counsel's referring to dental pain jurors may have experienced and the treatment they received. Novartis further moves in its omnibus motion to preclude Hill from arguing to the jurors that in evaluating Hill's case, they should "consider their own experiences with dental pain and the treatments they have received,"

11

contending that it would be unduly prejudicial to Novartis for Hill to ask the jurors to compare her situation to theirs.

So far as Hill's opening statement is concerned, the motion is granted, as the purpose of an opening statement is to briefly summarize evidence that will be offered, and not to offer arguments, let alone appeals to the jurors' personal experiences. But the Court declines to rule at this point as to whether an argument of this kind can be made on Hill's summation, since that determination will turn in part on what evidence has been introduced. Accordingly, this prong of Novartis's motion is granted as to Hill's opening statement, and denied as to Hill's closing argument, without prejudice to being re-raised just prior to that closing statement.

7. Exclusion of reference to other litigation involving bisphosphonates. Novartis further moves to preclude Hill from introducing argument or evidence about other litigation involving bisphosphonates, both because it is irrelevant, see Fed. R. Evid. 401, 402, and because, assuming arguendo it is relevant, it would be confusing, see Fed. R. Evid. 403. As a general proposition, this is correct, and so, for most purposes, reference to, and evidence of other litigation is excluded. It is possible, of course, that reference to other Zometa cases will come up in, for example, cross-examination of experts who have given prior testimony in such cases or in the MDL proceedings. In such instances, counsel for the parties should either

12

agree between themselves as to how the references are to be worded so as to minimize prejudice or else approach the side-bar so that the Court can set appropriate limitations.

B. Novartis's motion in limine #2. In its second motion in limine, Novartis seeks to exclude evidence or argument suggesting that it had a duty to warn the dental providers who treated Hill about the risk of developing ONJ through the use of Zometa. Novartis contends that under the "learned intermediary" doctrine, its duty to warn extended only to Hill's prescribing physicians, Drs. John Thompson and Aminder S. Mehdi.  Based upon this premise, Novartis further argues that Hill should be precluded from offering evidence or argument to suggest that Novartis's duty to warn extended to any other individuals, including Hill herself, her dentists, oral surgeons, or other health care providers.

Under the learned intermediary doctrine, the duty to warn of risks inherent in the use of prescription drugs "runs to the physician, not to the patient." Carlin v. Superior Court, 13 Cal.4th 1104, 1116 (1996) (citing, inter alia, Valentine v. Baxter Healthcare Corp., 68 Cal.App.4th 1467, 1483 (1999)). The rationale behind the learned intermediary doctrine is threefold: "'(1) The doctor is intended to be an intervening party in the full sense of the word.  Medical ethics as well as medical practice dictate independent judgment, unaffected by the manufacturer's control, on the part of the doctor.  (2) Were the

13

patient to be given the complete and highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug, thereby jeopardizing his life. (3) It would be virtually impossible for a manufacturer to comply with the duty of direct warning, as there is no sure way to reach the patient.'" Carmichael v. Reitz, 17 Cal.App.3d 958, 989 (1971); accord Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 130 (9th Cir. 1968) ("Ordinarily in the case of prescription drugs warning to the prescribing physician is sufficient.")

That said, however, the doctrine, "where it applies at all, applies only if a manufacturer provided adequate warnings to the intermediary." Stewart v. Union Carbide Corp., 190 Cal.App.4th 23, 29 (2010). See also Love v. Wolf, 226 Cal.App.2d 378, 395 (1964) ("In the case of a drug . . . there is a duty to exercise reasonable care to warn of potential dangers from use even though the percentage of users who will be injured is not large. But if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed."). Consequently, where a manufacturer provides inadequate warnings, or no warning at all, it "[cannot] rely upon the intermediary, even if [learned], to pass on or give warnings." Stewart, 190 Cal.App.4th at 30. While Novartis

14

appears to suggest that a drug manufacturer's duty to warn of risks associated with its prescription drugs runs only to a prescribing physician regardless of the adequacy of the warnings, Novartis has provided no authority -- and the Court's research reveals no authority -- to support such a proposition.

If Hill's September 24, 2012 opposition to Novartis's August 21, 2012 motion for summary judgment is any indication, Hill intends to present evidence at trial showing that Novartis did not give prescribing physicians adequate warning of the potential ONJ risk inherent in Zometa usage. If Hill is in fact able to proffer to the Court evidence sufficient for a jury to infer that Novartis's warnings to the prescribing physicians were inadequate, Hill would not be precluded under the learned intermediary doctrine from introducing such evidence and from arguing that Novartis's duty to warn ran to individuals other than her prescribing physicians. While Novartis would then be entitled to a jury instruction directing the jury not to consider such a duty where the jury found that the warnings to the physician were inadequate, it could not preclude Hill's counsel from introducing evidence and argument to the contrary.

Accordingly, the motion is denied for now, without prejudice to being re-raised if Hill is unable to adduce evidence sufficient for a reasonable juror to infer that the warnings given to the physicians were inadequate.

15

C. Novartis's motion in limine #3. In its third motion in limine, Novartis moves on various grounds (familiarity with which is here assumed) to exclude eight emails and one letter written by Novartis employees. With two exceptions, the Court finds that the emails are properly admissible. The two exceptions are: (i) a Monday, January 31, 2005 6:16 p.m. email from Annmarie Petraglia to YongJiang Hei et al., which the Court excludes under Fed. R. Evid. 401, 402, and 403; and (ii) the January 18, 2004, letter from Sam Klein to Deborah Dunsire. As to the latter, the Court, right before the letter is offered in evidence, will need to conduct a brief evidentiary hearing on the nature of Klein's relationship with Novartis and the circumstances surrounding the preparation of the letter in order to rule on its admissibility.

D. Novartis's motion in limine #4. Novartis moves "to exclude evidence and argument . . . that [Novartis] should have altered the FDA-approved prescribing information by (1) including a black box warning, (2) recommending a dosing regimen different than that approved by the FDA, or (3) using different label formatting, e.g., placing the initial warning regarding [ONJ] in a section of the label other than the adverse reactions section or using a different font size or bolded text." The Court addresses these issues in turn.

Novartis first contends that Hill should be precluded from offering argument or evidence that Novartis should have added a black box warning about ONJ on the label for Zometa. In her opposition, Hill

represents she will not offer argument or evidence on black box warnings. Thus, Novartis's motion is granted to the extent Novartis seeks to exclude argument or evidence about black box warnings.

Novartis further contends that Hill should be precluded from offering any argument or evidence "suggesting that [Novartis] should have altered the FDA-approved labeling by recommending a different dosing regimen than that approved by the FDA, e.g., recommending that doctors give the drug at a lower dose, less frequently, or on a different dosing schedule (such as terminating use after a certain number of doses or number of months of treatment).  Relying principally on PLIVA, Inc. v. Mensing, 131 S.Ct. 2567 (2011), Novartis contends, that "[Novartis] could not have made any such recommendation without prior FDA approval, and . . . any claim to the contrary impinges on FDA's authority and is preempted.  Since such claims are preempted, any evidence or argument seeking to advance those claims must be excluded . . . ."

The Mensing decision arises from the consolidated cases of Gladys Mensing and Julie Demahy, plaintiffs in lawsuits involving state-law failure to warn claims against drug manufacturers. The two plaintiffs were prescribed Raglan, the brand name for metoclopramide, a drug designed to speed the movement of food through the digestive system. Mensing, 131 S.Ct. at 2572.  Instead of receiving Raglan from their pharmacists, however, the plaintiffs received generic metoclopramide.  After taking the drug for several years, both women

17

developed a movement disorder known as tardive dyskinesia.  Mensing and
Demahy sued the manufacturers of the generic metoclopramide in separate
suits, alleging that long-term metoclopramide use caused their
dyskinesia and that the manufacturers were liable under, respectively,
Minnesota and Louisiana tort law for failing to provide adequate warning
labels.  In both cases the manufacturers asserted that federal law
preempted the state law claims, contending that because federal statutes
and FDA regulations required them to use the same safety and efficacy
labeling as their brand-name counterparts, it was impossible for them
to comply with both federal law and any heightened state law duty
requiring the use of a different label.  The Fifth and Eighth Circuits
rejected these arguments and held that Mensing's and Demahy's claims
were not preempted.  The Supreme Court reversed.  <u>Id.</u> at 2573.

In doing so, the Court first observed that "[f]ederal law imposes
far more complex drug labeling requirements [than state law] . . . .
Under the 1962 Drug Amendments to the Federal Food, Drug and Cosmetic
Act, a manufacturer seeking federal approval to market a new drug must
prove that it is safe and effective and that the proposed label is
accurate and adequate. Meeting those requirements involves costly and
lengthy clinical testing. [¶] Originally, the same rules applied to
all drugs.  In 1984, however, Congress passed the Drug Price Competition
and Patent Term Restoration Act, commonly called the Hatch-Waxman
Amendments.  Under this law, 'generic drugs' can gain FDA approval

18

simply by showing equivalence to a reference listed drug that has already
been approved by the FDA. This allows manufacturers to develop generic
drugs inexpensively, without duplicating the clinical trials already
performed on the equivalent brand-name drug . . . . [¶] As a result,
brand-name and generic drug manufacturers have different federal drug
labeling duties.  A brand-name manufacturer seeking new drug approval
is responsible for the accuracy and adequacy of its label. A manufacturer
seeking generic drug approval, on the other hand, is responsible for
ensuring that its warning label is the same as the brand name's."
Mensing, 131 S.Ct. at 2574 (internal citations omitted).  In these
circumstances, the Court found changes to generic drug labels were
permitted "only when a generic drug manufacturer changes its label to
match an updated brand-name label or to follow the FDA's instructions,"
and that "changes unilaterally made to strengthen a generic drug's
warning would violate the [federal] statutes and regulations requiring
a generic drug's label to match its brand-name counterpart's." Id. at
2575.

        Novartis now contends that the holding of Mensing applies not
only to generic manufacturers but also to brand-name manufacturers and
that, under Mensing, it would be contrary to federal regulations for
a manufacturer to provide added or strengthened warnings recommending
a particular dosing regimen for a brand-name drug once the FDA has
approved a certain dosage or course of administration.  Thus, Novartis

that contends it could not, as a matter of law, have altered the warning label for Zometa to reflect an alternative dosing regimen without prior FDA approval, the corollary being that it would have been impossible for Novartis to simultaneously comply both with FDA regulations and any heightened duty of care it may have had under California's strict liability and negligent failure-to-warn jurisprudence.

Novartis's argument, however, ignores the discretion given to the manufacturer that obtained FDA approval for the original drug to unilaterally strengthen warnings in certain circumstances. As the Supreme Court noted in Wyeth v. Levine, "[g]enerally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application. There is, however, an FDA regulation that permits a manufacturer to make certain changes to its label before receiving the agency's approval. Among other things, this 'changes being effected' (CBE) regulation provides that if a manufacturer is changing a label to 'add or strengthen a contraindication, warning, precaution, or adverse reaction' or to 'add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product,' it may make the label change upon filing its supplemental application with the FDA; it need not wait for FDA approval." 555 U.S. 555, 568 (2009) (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A), (C)). In Wyeth, the Supreme Court effectively rejected the argument Novartis makes here, holding a manufacturer could

unilaterally alter the warning label for a brand-name drug under the CBE process even if the FDA had already approved the current label. Id. at 572. Mensing is entirely consistent with Wyeth, see Mensing, 131 S.Ct. at 2581, and is thus of no assistance to Novartis.

In the alternative, Novartis contends labeling changes involving recommended dosages are not considered changes-being-effected (for which no FDA approval would be required for label modifications) but rather "[c]hanges requiring supplement submission and approval prior to distribution of the product made using the change." 21 C.F.R. § 314.70(b). These changes, known as "major changes," include "any change in the drug substance, drug product, production process, quality controls, equipment, or facilities that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product." Id., § 314.70(b)(1).

Novartis argues that a labeling change recommending a reduced dosing of Zometa, for instance, would have an adverse effect on the strength and potency of the drug and would therefore constitute a major change necessitating FDA approval. But Novartis has provided no evidence of what the FDA-accepted definitions for strength, potency and dosage are. A cursory review of pharmaceutical case law suggests that strength refers to the amount of an active ingredient in a particular dosage

form (e.g., 100 mg of zoledronic acid per tablet, 0.10 mg of zoledronic acid per 1 mL vial, etc.), whereas dosage refers to the number of administrations of the drug in a given time period (e.g., 2 tablets every eight hours, 8 milliliters every two days, etc.). If this is in fact the case, different dosages would not, as Novartis contends, affect the strength of a drug -- that is to say, regardless of whether one ingests two tablets or four tablets of a drug, the amount of active ingredient in each tablet remains the same. Moreover, subsection (b)(2)(v) -- the portion of the CFR that discusses what labeling changes constitute major changes -- does not mention the term "dosage" or any variation thereof. See 21 C.F.R. § 314.70(b)(2)(v). The only portion of the CFR that says anything about dosage warnings is subsection (c)(6)(iii), which provides a manufacturer may use the CBE process "[t]o add or strengthen a statement . . . about overdosage" and "[t]o add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product." 21 C.F.R. § 314.70(c)(6)(iii)(B), (C). If dosage warnings were subsumed within the category of major changes, as Novartis contends, there would have been no reason for the CFR to directly address dosage warnings within the category of changes-being-effected. Finally, Novartis fails to address the Supreme Court's holding in Wyeth that manufacturers are presumptively able to change the instructions about dosage for a brand-name drug without FDA approval under the CBE process "[a]bsent

22

clear evidence that the FDA would not have approved a change[.]" Wyeth, 555 U.S. at 571.  Novartis has provided no evidence, let alone clear evidence, to suggest that warnings reflecting a more conservative dosing regimen for Zometa would have been rejected by the FDA.  Under these circumstances, the Court cannot, at least on the current record, preclude Hill from offering argument or evidence that Novartis should have altered the FDA-approved labeling by recommending a different dosing regimen than approved.  Accordingly, Novartis's motion is denied in this respect.

Last, Novartis contends Hill should be precluded "from suggesting that [Novartis] should have formatted the Zometa labeling differently because such argument is barred by 21 U.S.C. § 337a and threatens FDA's primary jurisdiction."  Directing the Court to Pom Wonderful LLC v. Coca-Cola Co., 679 F.3d 1170 (9th Cir. 2012) and 21 C.F.R. § 201.57(d), Novartis contends that because the FDA "comprehensively regulates the formatting of prescription drug labeling," any "challenges to the FDA-approved formatting [would] undermine FDA's considered judgments[.]" Against this background, Novartis moves the Court to bar Hill from arguing "that the FDA-approved label [for Zometa] should have placed the warning regarding ONJ in a different section of the label, or should have utilized a different font size or bolded text."

The Court agrees. FDA regulations for prescription drug labeling extend not only to content but to formatting.  See 21 C.F.R. §§ 201.56, 201.57; see also FDA and HHS Final Rule, Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 FR 3922-01 (January 24, 2006).  While the case law is clear that manufacturers may modify the contents of a brand-name drug label without FDA approval by adding to or strengthening the warnings, Hill has provided no authority -- and the Court's research reveals no authority -- to suggest manufacturers may do the same with the label's formatting. Accordingly, Novartis's motion is hereby granted to the extent it seeks to preclude Hill from arguing that the Zometa labeling should have been formatted differently.

E. Novartis's motion in limine #5. In its fifth motion, Novartis moves to exclude (1) an article entitled "The Twenty-First Hijacker," written by Hill's treating physician Dr. Nicolas Veaco and published in the January-February 2009 issue of the Delta-Sierra Dental Digest, and (2) any "testimony on, or reference to, the claims, statements and/or opinions made or expressed within the article."  The Court agrees the article and any mention of its contents should be excluded at trial. The article is essentially an editorial piece interspersed with anecdotal remarks masquerading as scientific conclusions.  In it, Dr. Veaco purports to offer an opinion about the connection between ONJ and bisphosphonate usage, stating among other things:

24

-- My first experiences with bisphosphonates were with the
   intravenous kind. Dentists sent me patients for whom they
   did this or that and now needed someone to help to figure
   out why there was this large piece of dead bone in the
   patient's jaw.  As the first reports started showing up
   in our literature I started to understand this new entity
   called osteonecrosis.  I attended a course in Florida,
   read a book, did a Medline search and read every article
   I could find on the subject.  I went back and reviewed some
   of my [patients'] poor results and found that
   bisphosphonates accounted for many of them.


-- [E]xperts . . . quoted in the Los Angeles Times [ ] said,
   'the risk [of osteonecrosis] is somewhere between 1 in
   10,000 and 1 in 100,000 and it is not clear that this is
   increased by bisphosphonates . . . . [I]f it is not clear
   that [osteonecrosis] is increased by bisphosphonates,
   then I should have seen an osteonecrosis patient who did
   not take a bisphosphonate medication.  I have never seen
   a patient with persistent, exposed, necrotic bone who did
   not take bisphosphonate medication unless it was
   osteomyelitis, a neoplasm or as a result of radiation
   therapy."


-- We are told that we shouldn't worry about osteonecrosis
   in oral bisphosphonate users because the incidence is so
   low . . . . [¶] . . . [¶] The reason the incidence of
   osteonecrosis in oral bisphosphonate users is
   artificially low . . . is that there is no reporting
   requirement."


The Court notes that nothing in the article suggests that Veaco's

opinions could conceivably meet the requirements for scientific

reliability set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc.,

509 U.S. 79 (1993) and Federal Rule of Evidence 702. Among many other

deficiencies, Veaco does not describe the methodology by which he

reached his conclusions, nor does he claim to have any specialized

knowledge or experience that would have allowed him to reach the conclusions in the first place.  In its November 6, 2012 order granting Novartis's August 22, 2012 motion to exclude causation testimony from Veaco, the Court already found as follows:

> Dr. Veaco is not qualified under [Federal] Rule [of Evidence] 702 to offer an opinion on causation.  By his own testimony, Dr. Veaco is not expert in any aspect of oral or maxillofacial surgery, nor does he consider himself an expert on the issue of whether osteonecrosis of the jaw could conceivably be caused by bisphosphonate medications.  The only special education or training possessed by Dr. Veaco relating to the mechanism by which bisphosphonate medications affect the bone comes from a course he attended and a textbook he read the year he attended the course but has not read since; according to Dr. Veaco, the course was simply 'the preliminary discussion about a condition, presumably osteonecrosis of the jaw, 'that we were just starting to understand.'

The Court further found as follows:

> With respect to Plaintiff's diagnosis of osteonecrosis of the jaw, Dr. Veaco further testifie[d]: 'I'm not exactly sure how the connection with the intravenous bisphosphonates was made, whether her oncologist told me that she had had them. I'm not sure when I became aware of the condition and put the two together, but in my handwritten clinic note from when I saw her, I did note that she had had bisphosphonates, intravenous bisphosphonates as part of her treatment.  So I can't honestly say whether somebody else planted that seed or whether I was aware of the problem and made the connection.' In the Court's view, the foregoing demonstrates any testimony Dr. Veaco might offer about a causal connection between bisphosphonates and osteonecrosis of the jaw would be outside the scope of his professional knowledge.  Plaintiff has provided no argument or evidence to suggest Dr. Veaco is qualified to opine within a reasonable degree of medical certainty there is a connection between bisphosphonates and Plaintiff's osteonecrosis.

Even now, Hill provides no argument or evidence to show Veaco might be qualified to offer an opinion about the relationship between ONJ and bisphosphonate usage or how he could support his opinion under the Daubert factors. There is nothing offered that remotely meets the requirements of Fed. R. Evid. 702. Even if this were not so, moreover, the Court would exclude the article as being more prejudicial than probative under Federal Rule of Evidence 403.  United States v. Walls, 577 F.2d 690, 696 (9th Cir. 1978). The article has only minimal probative value given the vagueness of the opinions contained therein and the lack of any scientific foundation. The risk of undue prejudice posed by the article, on the other hand, is significant.  For instance, Veaco analogizes his hatred of bisphosphonates to the "unspeakable rage" expressed by the family members of the victims of serial killer Jeffrey Dahmer; compares the use of bisphosphonates to terrorism and the events of September 11, 2001; and makes bizarre statements like "I . . . hate every thin ethnically diverse 60s something woman who does yoga with such dignity in those horrible bisphosphonate commercials." Veaco's views have no place in the failure to warn analysis.  Based on the foregoing, Novartis's motion in limine #5 is hereby granted.

F. Novartis's motion in limine #6. Novartis moves to preclude Hill from offering argument or evidence "suggesting that, as a result of [Novartis's] alleged failure to provide adequate warnings, Plaintiff lost a chance to avoid ONJ or otherwise have a more favorable outcome

with regard to her jaw problems."  Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court agrees argument or evidence pertaining to a "loss of chance" should be excluded at trial.

"The 'lost chance' theory is essentially a relaxed standard of causation [that] reduces the plaintiff's burden of proof from a probability to a substantial possibility that [the defendant's misconduct] resulted in the [plaintiff's] loss of chance of survival." Williams v. Wraxall, 33 Cal.App.4th 120, 134 (1995).  California courts, however, have "decline[d] to establish a more lenient standard of causation . . . to account for the theory of lost chance," reasoning that to do so would "encourage . . . an unwarranted expansion of liability exposure." Dumas v. Cooney, 235 Cal.App.3d 1593, 1608 (1991).  Instead, as the Court noted in its November 29, 2012 order denying Novartis's August 21, 2012 motion for summary judgment, "the substantial factor test of the Restatement Second of Torts for cause-in-fact determination," under which "a cause in fact is something that is a substantial factor in bringing about [a plaintiff's] injury," remains the standard for causation in products liability actions.  Hill v. Novartis, 2012 WL 6004161, at *2 (E.D.Cal. 2012) (quoting Rutherford v. Owens-Illinois, Inc., 16 Cal.4th 953, 968-69 (1997)).  "In the context of products liability actions for which causation can only be shown by scientific or medical evidence, this standard of proof requires

28

the plaintiff to establish to a reasonable degree of medical probability based upon competent expert testimony that the defective product supplied by the defendant was a substantial factor in causing or contributing to the plaintiff's injury." Id. (citing Bockrath v. Aldrich Chemical Co., Inc., 21 Cal.4th 71, 79 (1999)). Hill provides no compelling argument why the Court should deviate from this standard.

Moreover, "[t]he lost chance doctrine, even when recognized, has been limited to medical malpractice cases to grant recovery to patients for deprivation of the opportunity of more beneficial treatment and the resulting gain in life expectancy or comfort, although the evidence fails to establish a reasonable probability that without defendant's negligence a cure was achievable." Williams, 33 Cal.App.4th at 135 (internal citations omitted). Hill has provided no authority -- and the Court's research reveals no authority -- to suggest that the doctrine could conceivably apply in a products liability case where, as here, the plaintiff alleges that a pharmaceutical manufacturer's failure to warn of risks associated with a prescription drug caused the plaintiff to develop a condition she would not otherwise have developed had she not taken the drug. See id. ("Where . . . [plaintiff] was not faced with the prospect of a preexisting condition which rendered proof of a reasonable probability of causation difficult, we can perceive of no reason to relax the established standard of proof of

causation"). Based on the foregoing, Novartis's motion in limine #6 is hereby granted.

G. Novartis's motion in limine #7. Novartis also moves to exclude "evidence of [Novartis's] knowledge or conduct regarding the alleged risk of [ONJ] that post-dates September 27, 2004 -- the date . . . Hill . . . received her last dose of Zometa," contending such evidence is irrelevant and inadmissible under Fed. R. Evid. 401, 402, 403 (dealing with relevance and prejudice) and 407. (Rule 407 provides, in pertinent part, that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: [¶] • negligence; [¶] • a culpable conduct; [¶] • a defect in a product or its design; or [¶] • a need for a warning or instruction.")

To the extent Novartis seeks to exclude evidence of modifications to the Zometa label that Novartis may have implemented after Hill stopped receiving infusions of Zometa, the motion must be granted pursuant to Rule 407. Evidence that a manufacturer changed a product's warning label after a plaintiff was allegedly injured by the product is not admissible in a failure-to-warn case because such evidence could lead a jury to infer the manufacturer "added the warning because [it believed] the product was unsafe without it." Chlopek v. Federal Ins. Co., 499 F.3d 692, 700 (7th Cir. 2007). "[This] is precisely the type of inference that Rule 407 forecloses[ ] in order

to avoid discouraging the taking of remedial measures." Id.; accord Raymond v. Raymond Corp., 938 F.2d 1518, 1523 (1st Cir. 1991); see Werner v. Upjohn Co., Inc., 628 F.2d 848, 858-860 (4th Cir. 1980). Hill argues that the changes Novartis made to the Zometa label do not fall within Rule 407 because the "changes" involved nothing more than the inclusion of "intentionally misleading 'well-documented risk factors' language" designed to "sen[d] doctors on a wild goose chase if they consulted the [ ] label in an attempt to determine what was causing their patients' [ONJ]," and were therefore not "subsequent remedial measures" as defined by the Rule. An identical argument was rejected in Chlopek, which held a plaintiff could not avoid the effect of Rule 407 simply by arguing a label change was not prompted by safety concerns. The Chlopek court held that a manufacturer's "motive for making the change is irrelevant." Chlopek, 499 F.3d at 700.

However, to the extent Novartis seeks a blanket exclusion of all evidence reflecting its knowledge or conduct postdating Hill's infusions, Novartis's motion is denied, without prejudice to being renewed at trial with respect to any particular item of proferred evidence. Mahaney ex rel. estate of Kyle v. Novartis Pharmaceuticals Corp., 835 F.Supp.2d 299 (W.D. Ky. 2011), is instructive on this issue. In Mahaney, another Zometa case, Novartis moved to exclude argument and evidence of its knowledge and conduct postdating the patient's Zometa treatment. Id. at 313. Novartis argued that its actions

following treatment were irrelevant because the prescribing physician could only have considered Zometa warnings at the start of the patient's therapy and that any subsequent knowledge it might have possessed about the connection between Zometa and ONJ was similarly irrelevant because it would have arisen after the patient began her treatment. In the alternative, Novartis requested (as it does here) that the court draw a strict time boundary for the admission of evidence. Id.

The Kentucky court disagreed: "Conceptually, this request makes sense; practically it does not. No matter which date the Court chooses, documents or actions by [Novartis] after that date could bear (or may be interpreted by a jury as bearing) on [Novartis's] earlier knowledge about ONJ and Zometa. To ensure legitimate evidence was not excluded simply as a result of the date it was created, the Court would have to review all evidence dated after the temporal dividing line and determine whether it implicated [Novartis's] knowledge at an earlier stage in Zometa's development. [¶] Such a course is improper for two reasons. First, it is unduly burdensome. The record for this matter is vast and to conduct such a review before trial would embroil the Court and parties in a pitched battle over countless documentary exhibits. Second, deciding what a jury could or could not infer from a potential exhibit would require the Court to make impermissible judgments on fact issues that are reserved strictly for the jury." Mahaney, 835 F.Supp.2d at 313.

32

The Kentucky court then proposed the following approach: "Rather than intruding into the jury's arena, the Court will deny [Novartis's] request for a strict rule deciding the admissibility of documents between the beginning of Kyle's treatment, its termination and her tooth extraction. [Novartis] may instead point out the temporal discrepancies in documents and its actions during its own arguments and during the cross examination of Plaintiff's witnesses.  It may also offer individualized objections to the introduction of evidence at trial if it believes the jury is incapable of drawing the necessary inferences." Id. at 313-14.  The Court finds Mahaney's reasoning to be persuasive and adopts the same approach here.

H. Novartis's motion in limine #8.  In its final motion in limine, Novartis moves, first, to exclude "any evidence that [Hill] allegedly lost wages or incurred out-of-pocket expenses as a result of her alleged injuries," contending that Hill testified at her deposition "that she could neither identify nor quantify any lost wages, and stated that she did not incur any out-of-pocket expenses."  In her opposition, Hill represents she will not offer evidence of lost wages or out-of-pocket expenses.  Accordingly, this prong of Novartis's motion #8 is hereby granted.

Novartis further moves to exclude "evidence of medical expenses that were not actually paid to [Hill's] healthcare providers."  Relying on Howell v. Hamilton Meats & Provisions, Inc., 52 Cal.4th 541 (2011),

33

Novartis contends that "evidence of medical expenses that are not actually paid for tortuously -- incurred [sic] personal injuries through insurance or otherwise (i.e., expenses that are discounted or 'written off' by the healthcare provider) are not relevant on the issue of past medical expenses." Novartis points to the medical expenses that were actually paid on behalf of Hill to Hill's healthcare providers ($27,962.42 to St. Joseph's Medical Center and $1,533.53 to Brookside Oral & Maxillofacial Surgery), and argues that only these amounts -- and not the amounts actually charged and billed by the providers ($189,387.50 by St. Joseph and $6,935.00 by Brookside) -- are relevant and admissible on the issue of Hill's past medical expenses.

Given Novartis's reliance on Howell, a state case arguably dealing with the admissibility of such evidence, it is important to note, as a preliminary matter, that the Federal Rules of Evidence will "ordinarily govern in diversity cases." Wray v. Gregory, 61 F.3d 1414, 1417 (9th Cir. 1995). Absent a showing that a state rule of evidence is "intimately bound up with the state's substantive decision making," the Federal Rules drive the Court's analysis. See Feldman v. Allstate Ins. Co., 322 F.3d 660, 666 (9th Cir. 2003). It is true that Howell, and cases following it, proceed in the shadow of California's "collateral source rule," which "has an evidentiary as well as a substantive aspect." Howell, 52 Cal. 4th at 552. Viewed as the outcome of a substantive policy judgment, California's collateral source rule

34

provides that an injured plaintiff may recover from the tortfeasor money that a "collateral source" -- quintessentially an insurer -- paid on his or her behalf, and thus encourages the purchase of insurance by Californians. See Howell, 52 Cal.4th at 551; Helfend v. Southern Cal. Rapid Transit Dist., 2 Cal.3d 1, 10 (Cal. 1970) ("The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities."). As an evidentiary rule, the collateral source rule renders evidence of a collateral source payment inadmissible for the purpose of reducing the amount of damages and, for all other purposes, subject to the rule that its probative value must be "carefully weigh[ed] . . . against the inevitable prejudicial impact such evidence is likely to have on the jury's deliberations." Id. at 552 (quoting California Evidence Code § 352).

There is some confusion in the courts regarding the "substantive" nature of the collateral source rule and its potential to displace the Federal Rules under a standard "Erie" analysis. Indeed, the Tenth Circuit once grouped the collateral source rule with the parol evidence rule and the statute of frauds as "substantive rules" that "Congress did not intend the procedural rules [of evidence] to preempt . . . . [A]lthough the application of these rules will affect the admissibility of some evidence, they in reality serve substantive state policies regulating private transactions." Blanke v. Alexander, 152

35

F.3d 1224, 1231 (10th Cir. 1998); but see Sims v. Great American Life Ins. Co., 469 F.3d 870, 879 (10th Cir. 2006) (holding that "Erie is inapplicable to the Federal Rules of Evidence."). See also Davis v. Odeco, Inc., 18 F.3d 1237, 1243 (5th Cir. 1994) (describing the collateral source rule as substantive, and noting that "[m]arried to this substantive rule is an evidentiary rule that proscribes introduction of evidence of collateral benefits out of a concern that such evidence might prejudice the jury."); McDowell v. Brown, 392 F.3d 1283, 1295 (11th Cir. 2004) ("Some state evidentiary rules are substantive in nature, and transcend the substance-procedure boundary, creating a potential Erie conflict.") (citing Bradford v. Bruno's, Inc., 41 F.3d 625 (11th Cir. 1995) (holding that Alabama's collateral source rule is substantive in nature)).

Ultimately, the Court concludes that the California Supreme Court's description of the two discrete aspects of the collateral source rule obviates any Erie conflict and does not establish that the evidentiary corollary of the collateral source rule is "intimately bound up" with the state's substantive policy judgment. Howell plainly establishes that the collateral source rule is a substantive rule of damages under California law. California state court decisions deriving evidentiary rules from this substantive principle of damages are, by contrast, modes of procedural reasoning that mirror the Federal Rules's considerations of relevance and prejudice. As the First Circuit held

in a non-binding but directly apposite case, "the Federal Rules of Evidence (and in particular Rules 401, 402, and 403) are malleable enough to deal with the principal evidentiary issues contemplated by the collateral source rule: relevancy and unfairly prejudicial effect." Fitzgerald v. Expressway Sewerage Const., Inc., 177 F.3d 71, 74 (1st Cir. 1999). See also 19 Wright & Miller, Federal Practice and Procedure § 4512 (2d ed. 2012) ("If a Federal Rule of Evidence covers a disputed point of evidence, the Rule is to be followed, even in diversity cases, and state law is pertinent only if and to the extent the applicable Evidence Rule makes it so.").

Consequently, the parties' briefing on this motion, in which both sides cite a litany of California state cases, is misguided insofar as the briefing assumes that a California case will dispositively settle their evidentiary dispute. While the Court looks to these cases, such as Howell and the very recent decision in Corenbaum v. Lampkin, Nos. B236227, B237871, 2013 WL 1801996 (Cal. Ct. App. Apr. 30, 2013), as sources of persuasive authority regarding considerations of relevancy and prejudice, ultimately the issue must be decided under Federal Rules of Evidence 401, 402, and 403.  Nevertheless, the issue is somewhat academic here because even if the Court were to apply California law here, the result would be the same. Put differently, the Court finds that, under both the Federal Rules and state law, Novartis's motion should be granted.

From the standpoint of state law, the most recent pronouncement in Cedarbaum, in which the Court of Appeal for the Second District extended the holding of Howell and held evidence of billed-but-written-off amounts irrelevant both to noneconomic damages and future economic damages. See Corenbaum, 2013 WL 1801996.[1] In holding that evidence of amounts billed above the amount actually paid were irrelevant to determining future damages or noneconomic damages, the Corenbaum court made particular reference to the likelihood that such evidence "would most certainly cause jury confusion and suggest the existence of a collateral source payment, contrary to the evidentiary aspect of the collateral source rule." Id. at *8.

The Court's analysis under the Federal Rules dovetails with the Court of Appeal's analysis under state law in Corenbaum. The Court concludes that because evidence of any amounts billed above the amounts paid are not of consequence in determining plaintiff's damages claim under California law, and because such evidence would be of only modest probative value for other purposes, such evidence would have extremely limited relevance under Rule 401 and its introduction would likely confuse and mislead the jury into considering collateral payments within their damages calculation if introduced at trial. Consequently, the prejudice of introducing such evidence substantially outweighs its probative value, if any. See Fed. R. Evid. 403. Accordingly, Novartis's

---

[1] Earlier California cases arguably to the contrary all predated Howell. See, e.g., Olsen v. Reid, 164 Cal.App.4th 200, 204 (2008).

motion to exclude evidence of medical expenses billed but not ultimately paid is granted.

In accordance with the foregoing, Novartis's motions in limine are hereby GRANTED in part, DENIED in part and RESERVED in part.[2]

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       May 10, 2013

_____

[2] Separately, both Hill and Novartis raise objections to the admissibility of certain depositions proffered by the other. The objections will be dealt with in a separate order.